Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000638
02-JUL-2015
10:04 AM

CAAP-12-0000638

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KILANI DEREGO, Defendant-Appellant,
and
MICHAEL ROBLES, Defendant-Appellee.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 10-1-1469)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Leonard, JJ.)

Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Kilani Derego (Derego) and co-defendant Michael Robles (Robles) with second-degree murder for intentionally or knowingly causing the death of Charlys Tang (Tang).[1] Tang was a taxicab driver who died from injuries he

---

[1] Derego and Robles were charged with violating Hawaii Revised Statutes (HRS) §§ 707-701.5 (2014) and 706-656 (Supp. 2010), which provide in relevant part:

> §707-701.5. **Murder in the second degree.** (1) . . . [A] person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

> (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

(continued...)

sustained during an assault. After Robles was arrested, Robles made statements to the police, telling them that he and Derego had taken a taxicab; when the taxicab stopped, Derego and the taxicab driver had gotten into an argument; Derego assaulted the driver, knocking him to the ground; Robles grabbed Derego but also kicked the driver a few times; and Derego repeatedly punched and kicked the driver while he was on the ground.

The Circuit Court of the First Circuit (Circuit Court)[2] severed the defendants and ordered separate trials. Robles went to trial first. At his jury-waived bench trial, Robles testified that he played a minor role in the assault on Tang, but that Derego initiated the assault and was primarily responsible for Tang's injuries. The Circuit Court found Robles guilty of the lesser included offense of manslaughter.

At Derego's trial, the State called Robles as a witness. Robles answered some questions and acknowledged that he had made statements to the police and had testified at his trial. Robles, however, refused to answer questions about events relating to the alleged murder or his statements to the police about such events. Robles instead asserted the Fifth Amendment privilege against self-incrimination and refused to answer questions about these matters, even though the Circuit Court advised Robles that he had no right to assert the privilege and instructed him to answer the questions. The Circuit Court permitted the State to introduce statements Robles had made to the police that described Derego as the person responsible for

---

[1] (...continued)
    §706-656. Terms of imprisonment for first and second degree murder and attempted first and second degree murder.

    . . . .

    (2) . . . [P]ersons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority[.]

[2] The Honorable Dexter D. Del Rosario presided over the proceedings relevant to this appeal.

causing Tang's death.   The jury found Derego guilty as charged of second-degree murder.

On appeal, Derego contends that: (1) the Circuit Court's admission of Robles' statements to the police, which implicated Derego in the murder of Tang, violated Derego's constitutional right to confront the witnesses against him because Derego was unable to cross-examine Robles about the subject matter of Robles' statements to the police; (2) Derego's trial counsel provided ineffective assistance in failing to seek a jury instruction on the unreliability of eyewitness testimony; and (3) the Circuit Court's failure to advise Derego of his right not to testify pursuant to Tachibana v. State, 79 Hawai'i 226, 900 P.2d 1293 (1995), constituted harmful error.

As explained below, we need not address Derego's constitutional confrontation claim because we conclude that the Circuit Court erred in admitting Robles' hearsay statements to the police incriminating Derego under the Hawai'i Rules of Evidence (HRE).   We vacate Derego's conviction and remand the case for a new trial.

BACKGROUND

I.

Derego and Robles both resided at a therapeutic group home run by Hale Kipa (Hale Kipa facility) for individuals who were seventeen to eighteen years old.[3/]   Jumanne Washington, a Hale Kipa facility lead counselor, testified that Derego and Robles were very good friends and described Derego as being a "leader" and Robles as a "follower."   On Friday, April 30, 2010, Robles left the Hale Kipa facility at about 7:00 a.m. on OTR or "Out-To Return," which is an overnight or weekend pass allowing facility residents to stay with their families.   Robles also left the facility that day.

_____

[3/] Hale Kipa was described at trial as a "private nonprofit social services organization" which operates therapeutic group homes.

Vinson Hao (Hao) testified that in the afternoon on April 30, 2010, he took the bus with Derego, Robles, and another male to Waikīkī, but later separated from the group. Hao's mother picked Hao up in Waikīkī at about 10:50 or 10:55 p.m. Before Hao was picked up by his mother, he saw Derego and Robles walking in Waikīkī.

City bus driver Philip Butay (Butay), on his last run before finishing work at about 1:50 a.m. on May 1, 2010, was driving in Waikīkī on Kūhiō Avenue. At the bus stop across from Big Kahuna Restaurant, a boy, whom Butay later identified as Derego, placed his foot on the first step of the bus and asked Butay if Butay was going to Waipahu. Butay informed the boy that Butay's bus did not go to Waipahu and that the boy needed to catch the Route 42 bus. During this encounter, Butay had a clear and unobstructed view of the boy for "[m]aybe about five, ten, fifteen seconds." Butay described the boy as between seventeen and twenty years old, "dark," with short hair, and weighing between 135 to 150 pounds. A second boy, whom Butay later identified as Robles, was standing on the sidewalk. Butay described the second boy as bigger (145 to 160 pounds), slightly older, and with a lighter complection than the first boy, and also with short hair. The second boy called out something like, "Let's go. He doesn't go to Waipahu" and began walking westward on Kūhiō Avenue.

As Butay drove from the bus stop, he saw the first boy waving the second boy into a taxicab. Butay saw the first boy sit in the back seat behind the driver and the second boy sit on the passenger side. Butay thought to himself that "wow" taking a taxi to Waipahu from Waikīkī would be expensive. The next morning, Butay told his wife about the incident with the two boys. Because Butay and his wife were frugal, he knew his wife would not agree with paying $50 to $60 for a taxi ride to Waipahu.

In the early morning on May 1, 2010, Craig Mansfield (Mansfield) saw three people standing in front of a taxicab in

the parking lot of the Waipahu Times Supermarket. Mansfield stopped and went to the corner of a building to smoke a cigarette. When he finished his cigarette, he saw people running whom he believed were the people he had seen earlier by the taxicab. As he passed near the taxicab, he saw a man lying on the ground with blood all around his head. Mansfield yelled out to a man and woman at a nearby gas station to call 911. Mansfield tried to rouse the man lying on the ground, but the man was unresponsive.

At about 1:55 a.m. on May 1, 2010, Honolulu Police Department (HPD) Officer Thomas DePonte (Officer DePonte) drove into the parking lot of the Waipahu Times Supermarket. People at the scene informed Officer DePonte that "there was a guy laying on the ground and two people [had] fled from the cab." Officer DePonte saw a man, later identified as Tang, lying on the ground about twenty feet from a white four-door Crown Victoria taxicab, which had its engine running, lights on, and driver's door ajar. Tang was lying face up, in a pool of blood around his head, with blood coming from his ears, and a large lump on his forehead. Tang was breathing, but was gurgling and mumbling unintelligibly. Tang was taken by ambulance to Queen's Medical Center, and the taxicab was towed to the main police station.

Tang was declared brain-dead by a doctor at Queen's Medical Center at 2:38 a.m. on May 1, 2010. An autopsy preformed on Tang revealed that he sustained fractures of the back and left side of his skull, facial bone, and orbital plates. The fracture of the back of his skull was "[a] very forceful injury" caused by his head striking a flat surface like the ground or by a blunt instrument striking the back of his head. The fracture to the left side of his skull was consistent with Tang being kicked in the head while on the ground. The fractures to his facial bone and orbital plates were blunt force injuries caused by a blunt instrument or a kick. Tang had bruising to the left side of his face, to his chest, to both sides of his abdomen, internally around his left kidney, which was torn and bleeding, and to his

5

right and left thighs.  The bruising was caused by blunt force trauma, such as kicks or punches.  Tang had no defensive wounds on his hands or feet.  The forensic pathologist who testified at trial opined that Tang's numerous fractures were caused by multiple blows and that the cause of death was injury to the head and brain -- "cranial cerebral injuries due to blunt force trauma to the head."

A taxicab "trip log" was found in Tang's taxicab.  The last entry in the trip log showed that Tang picked up two passengers at 1:16 a.m. at "Seaside" with the beginning mileage for that pickup recorded as 47,166.[4/]  The difference between the beginning mileage on the trip log and the ending mileage shown on the taxicab's odometer was 17 miles, approximately the distance between Waikīkī and the Waipahu Times Supermarket.

DNA swabs were taken from Tang and the taxicab.  An HPD criminologist conducted DNA testing of the swabs.  Swabs taken from the interior door handle of the left rear passenger door of the taxicab was consistent with a mixture of three or more individuals, and Derego could not be excluded as a possible contributor to this mixture.

On May 3, 2010, after learning of news reports that a taxi driver had been beaten in Waipahu, Butay (the City bus driver) called the police.  Butay went to the main police station where a graphic artist, based on Butay's description, drew composite sketches of the two boys Butay had seen in the early morning on May 1, 2010, who wanted to go to Waipahu.  While at the police station, Butay also saw a taxicab, which he was "99 percent sure" was the taxicab that the boys had taken.

In the evening on May 3, 2010, while watching the news, Eydie McNicoll (McNicoll), who worked as a site supervisor/case manager at the Hale Kipa facility, saw the composite sketches prepared by the HPD graphic artist.  McNicoll thought the

---

[4/] Seaside Avenue is a street in Waikīkī that intersects with Kūhiō Avenue.

sketches resembled Derego and Robles. The following morning, McNicoll learned that Derego and Robles had left the facility without authorization, so she called the police to report them as runaways. She also mentioned to the police that the composite sketches resembled Derego and Robles.

On May 6, 2010, Roblés was arrested in Waikīkī. Robles was with Derego at that time. On May 7, 2010, HPD Detective Gregory McCormick (Detective McCormick) conducted two recorded interviews with Robles. On that day, Detective McCormick had Butay come to the police station and showed Butay two different photographic lineups. In one lineup, Butay identified the photograph of Derego as the boy who put his foot on the bus and asked Butay if Butay was going to Waipahu. In the other lineup, Butay identified the photograph of Robles as the boy on the sidewalk. For each of the photographic lineups, Butay wrote that the boys "looked like" the boys he had seen in the early morning on May 1, 2010. Butay testified that he was positive that he had selected the photographs of the two boys he had encountered.

At about 11:20 p.m. on May 7, 2010, Derego was arrested in Waikīkī. Derego was processed and photographed after his arrest. Evidence Specialist Jasmina Eliza (Eliza) photographed Derego on May 8, 2010. The photographs Eliza took showed that Derego had red marks on the knuckles of his right hand, his right wrist and palm, left and right forearms, above his right eyebrow, around his left eye, and on the inside of his left calf. Eliza also photographed Derego's feet and observed that Derego's right foot appeared to be swollen. While Derego was being photographed, Detective McCormick noticed injuries on Derego's right hand and the top of his right foot.

On May 8, 2010, Detective McCormick met with Derego. When Detective McCormick informed Derego that he had been arrested for the murder of a taxi driver in Waipahu in the early morning hours of May 1st, Derego blurted out, "Honest to God you've got the wrong guy. I was staying at my father's at that time . . . and I've never even been in a taxi before."

7

II.

A.

Robles made several statements to the police on May 7, 2010, the day after his arrest. Robles first gave a recorded statement to Detective McCormick in which Robles stated that he was at the Hale Kipa facility all night on April 30, 2010, through the morning of May 1, 2010, and thus had not been in Waikīkī or Waipahu during that time. He indicated that he had no knowledge of an incident involving a taxicab driver.

B.

Robles then spoke to HPD Detective Allan Kuaana (Detective Kuaana). Robles initially told Detective Kuaana that he was at the Hale Kipa facility from the evening on April 30, 2010, through the morning of May 1, 2010, that he was not in Waikīkī or Waipahu during that time, and that he was not present and did not observe an incident involving a taxicab driver in Waipahu. Robles, however, subsequently admitted to Detective Kuaana that he had been with Derego in Waikīkī during the night in question; that they tried to catch a bus to Waipahu; that they instead caught a taxicab to Waipahu; that when they arrived in Waipahu, Derego and the taxicab driver argued over the fare; that Derego punched the driver; that Robles tried to stop Derego, but Robles also tried to kick the driver; that Derego broke free from Robles and attacked the driver with punches, causing the driver to fall to the ground and cover his head; that Derego continued to kick and punch the driver while the driver was on the ground; and that when Derego and Robles left the scene, the driver was "all bust up[.]"

C.

Robles then provided a second recorded statement to Detective McCormick. Robles stated that he snuck out of the Hale Kipa facility in the evening on April 30, 2010, and met Derego in Waikīkī. While on Kūhiō Avenue, Derego talked to a bus driver and asked if the bus went to Waipahu, but the driver said they needed to catch a different bus. Derego got a taxi and told

8

Robles to get in.  Derego sat behind the driver and Robles sat on the passenger side.  When the taxicab stopped, Derego and the driver began arguing, and everyone got out.  Derego threw the first punch, hitting the driver in the face.  The driver hit the ground "[a]nd then [they] just started whacking [the driver]."  Derego kept "whacking the driver" with his fist and leg, so Robles tried to grab Derego.  While grabbing Derego, Robles kicked the driver, who was attempting to stand up, to keep the driver away from them.  Derego broke away from Robles and continued to assault the driver, and Robles stood back and "let [Derego] do what he had to do."  Robles admitted that he kicked the driver more than once and that he could have kicked the driver in the head.  Derego told Robles, "let's go," and they ran from the scene.  When Robles last saw the driver, he looked "pretty fucked up."

D.

At Robles' bench trial, Robles testified in his own defense.  Robles had grown up and gone to elementary school with Derego on the Big Island.  After not seeing each other for about five years, they reunited when they were both assigned to the Hale Kipa facility.  Derego was a good friend of Robles.  Derego was interested in martial arts.  His specialty was Muay Thai kick-boxing, and he and Robles also practiced mixed martial arts together at the Hale Kipa facility.

Robles testified that on April 30, 2010, after 11:00 p.m., he snuck out of the Hale Kipa facility and met Derego in Waikīkī.  They both drank alcohol, and Robles also smoked marijuana.  At around 12:45 a.m., Derego said he wanted to go to Waipahu, so they walked to a bus stop on Kūhiō Avenue.  When the bus arrived, Derego put his foot on the first step and asked the bus driver if the bus was going to Waipahu.  The bus driver said no.  Derego then got into a taxicab and waved to Robles to join him.  While in the taxicab, Derego told Robles to get out and run when the cab stopped.

9

Robles testified that Derego and the driver began arguing over where Derego and Robles would be dropped off, and the driver stopped the cab. Robles got out and then ran. When he turned back, he saw Derego and the driver scuffling, so Robles went back to the cab. Robles saw Derego punch the driver in the face, causing the driver to fall. Derego repeatedly punched and kicked the driver who was holding on to Derego's leg. Robles tried to grab Derego, and Robles twice kicked the driver hard in the shoulder to make him let go of Derego's leg. Robles also kicked the driver, possibly in the face, to keep the driver away when the driver tried to grab Robles' shorts. Derego pushed Robles out of the way and kept "whacking" the driver, causing the driver's head to bounce off the concrete, and the driver "stopped defending himself." Derego, however, continued to assault the driver. Robles grabbed Derego, but Derego broke free, went back to the driver, and kicked the driver in the face. Derego and Robles then ran away.

## III.

The State called Robles as a witness during Derego's trial. After answering a few preliminary questions about his background, Robles was asked to identify Derego, whereupon he stated:

> Oh, with all due respect to the court and to the jury and the judge I would like to say that everything that I said in the statement and everything that I said in my trial were all a bunch of lies. And that I understand that everything that I said -- and I will be charged for perjury. I understand that, Your Honor, and I'm sorry for wasting the Court's time. And that's all I got to say. And I will plead the 5th to any questions that you guys may ask of me for today.

The Circuit Court called a recess, then ruled that Robles did not have a legal basis for asserting a Fifth Amendment right to remain silent in light of his prior trial and conviction. The Circuit Court continued the trial to give the parties the opportunity to submit briefs on how the examination of Robles should proceed and on the admissibility of Robles' prior statements. Both parties submitted briefs on these issue.

When trial resumed four days later, Robles testified that he had given two recorded statements to Detective McCormick and that the transcripts marked as exhibits by the State were accurate transcriptions of these recorded statements. Robles also testified that he had made statements to Detective Kuaana and had voluntarily testified under oath at his own trial.

Robles identified Derego in court and stated that they had first met at Hilo Elementary school, were good friends, and had not seen each other for five or six years before being reunited in 2010, when they were both assigned to the Hale Kipa facility. Robles testified that Derego talked about training in Muay Thai kick-boxing; that Derego was "good at" Muay Thai kick-boxing; that they talked about mixed martial arts; and that they had sparred and trained in mixed martial arts.

Robles stated that he left the Hale Kipa facility before 8:00 a.m. on April 30, 2010, and returned that evening. Robles, however, refused to answer, pleading "the Fifth," when asked by the prosecutor if he again left the Hale Kipa facility after 10:00 p.m. on April 30, 2010. The prosecutor then asked Robles a series of questions, with the prosecutor at times quoting from Robles' testimony at his trial, about events that purportedly led to Robles and Derego meeting later that night in Waikīkī. Derego's objections were overruled by the Circuit Court. The Circuit Court advised Robles that he did not have the right to assert the Fifth Amendment and instructed Robles to answer the questions, but Robles persisted in his refusal. The Circuit Court held a bench conference and directed the State to question Robles about his prior statements to the police before asking questions about Robles' testimony at his trial.

State resumed its examination by asking Robles questions about his initial statements to Detective Kuaana, in which he denied being present or observing any altercation with a taxi driver in Waipahu. Robles admitted that this was what he told Detective Kuaana. When asked about the substance of his subsequent statements to Detective Kuaana, in which he recounted

11

details of the events surrounding the fatal assault on the taxi driver, Robles refused to answer. Over Derego's objection, the State asked Robles a series of questions about the substance of these subsequent statements to Detective Kuaana, including questions regarding events that preceded the assault, the assault, and Derego's alleged role in the assault. Despite the Circuit Court's instructing Robles to answer these questions, Robles refused to answer, asserting the Fifth Amendment. The State then similarly asked Robles, over Derego's objection, a series of questions regarding the substance of Robles' second recorded statement to Detective McCormick, including questions about Robles' statements that incriminated Derego. Robles again refused to answer these questions, pleading the Fifth Amendment, despite the Circuit Court's instructing him to answer.

On cross-examination, Robles refused to answer questions posed by Derego's counsel. Derego's cross-examination consisted of the following:

> Q. Good morning, Mr. Robles.
>
> A. Good morning.
>
> Q. I have some questions for you. When you spoke to the police after your arrest, you basically lied to the police, right?
>
> A. I don't think I can answer any questions from that side either, due to the fact that my attorney advised me to plead the Fifth to the questions.
>
> THE COURT: Excuse me, counsel.
>
> Mr. Robles, your lawyer cannot advise you to take the Fifth, because I have already ruled and informed him you do not have a right to assert the Fifth in these circumstances, and I'm instructing you to answer the question.
>
> Q. (By [Derego's counsel]:) If I keep asking you questions, are you going to keep asserting the Fifth?
>
> A. Yes.
>
> Q. Isn't it true that you lied under oath about this whole thing?
>
> A. I plead the Fifth.
>
> Q. Isn't it true that [Derego] wasn't there?

A. I plead the Fifth.

Q. You went on trial for the killing of Charlys Tang, right?

A. I did.

Q. Right here in this very room, right?

A. Yes.

Q. And you blamed [Derego] to save your own skin, right?

A. I plead the Fifth.

. . . .

Q. (By [Derego's counsel]:) Mr. Robles, just so we're clear, if I ask you further questions, are you going answer those questions?

A. No.

[Derego's counsel]: I have no further questions.

The Circuit Court later ruled that it would permit the State to introduce Robles' statements to Detective Kuaana and Detective McCormick as prior inconsistent statements pursuant to HRE Rules 802.1 and 613(b) (1993). The recorded statements to Detective McCormick were introduced as exhibits. The statements to Detective Kuaana were introduced through the testimony of the Detective Kuaana. The Circuit Court ultimately ruled it would not permit the State to introduce Robles' testimony from his prior trial.[5]

IV.

The State called Derego's father (Father) who testified that Derego had not stayed with Father on the night in question -- April 30-May 1, 2010. Derego told Father that he was at Schofield Barracks that night.

---

[5] The Circuit Court analyzed Robles' testimony at his trial under HRE Rule 804(b)(1) (1993), the hearsay exception for former testimony. The Circuit Court ruled that Robles' former testimony did not satisfy this exception because the State's motive and interest in cross-examining Robles at Robles' trial was not similar to the interest and motive of Derego to cross-examine Robles. The Circuit Court also declined to admit Robles' testimony at his prior trial as a prior inconsistent statement, ruling that it may be cumulative of Robles' statements to the police, which the Circuit Court had permitted the State to introduce.

13

V.

The defense presented an alibi defense. Derego's girlfriend, Angelena Riverrain (Riverrain), testified that Derego came to her home in the morning of April 30, 2010, and they went to the Schofield Barracks apartment of Mahealani Cluck (Cluck) and her boyfriend, Reasuon Walls (Walls), arriving at about 7:00 p.m. Riverrain stated that Derego stayed with her at the apartment until they got up the next morning at 9:00 a.m. Cluck and Walls provided similar testimony.

Derego testified that in applying for an OTR weekend pass from the Hale Kipa facility, he falsely told the staff at the facility that he would be spending the weekend with his father. On the morning of April 30, 2010, he went to Ala Moana and met with Riverrain, Robles, and others. In the afternoon, he and Riverrain caught the bus to Riverrain's residence in Wahiawā, while Robles and the others said they were going to Waikīkī. That was the last time he saw Robles that day. At about 6:30 p.m., he and Riverrain were picked up by Cluck and Walls, and they all went to Cluck and Walls' apartment on Schofield Barracks. Derego stayed overnight at the apartment and woke up the next morning at about 9:30. Derego denied leaving the apartment that night to go to Waikīkī or Waipahu, seeing Robles that night, riding in Tang's taxi, assaulting Tang, or having any idea who killed Tang.

Derego returned to the Hale Kipa facility on May 2, 2010. He subsequently ran away from the Hale Kipa facility and was living on the streets when he was arrested on May 7, 2010.

VI.

The jury found Derego guilty as charged of second-degree murder. The Circuit Court sentenced Derego to life imprisonment with the possibility of parole to be served concurrently with any other terms being served. The Circuit entered its Judgment on June 20, 2012, and an Amended Judgment on August 6, 2012.

14

DISCUSSION

I.

Derego argues that Robles' assertion of the Fifth Amendment privilege against self-incrimination and refusal to answer questions prevented him from cross-examining Robles about the substance of his prior statements to the police. Derego therefore argues that the admission of Robles' prior statements to the police describing Derego as the main perpetrator of the assault on Tang violated Derego's constitutional right to confront the witness against him. The State, citing State v. Delos Santos, 124 Hawai'i 130, 238 P.3d 162 (2010), responds that the fact that Robles appeared at trial and testified was sufficient to satisfy the requirements of the confrontation clause. We need not address Derego's constitutional confrontation clause claim because we conclude that the Circuit Court erred in admitting Robles' hearsay statements incriminating Derego under the Hawai'i Rules of Evidence.

A.

At the outset, we note that the type of hearsay at issue in this case -- a confession by an accomplice to the police which incriminates the defendant -- has long been viewed with "special suspicion" and as ."presumptively unreliable." Lee v. Illinois, 476 U.S. 530, 539, 541 (1986). In Lilly v. Virginia, 527 U.S. 116 (1999), the United States Supreme Court referred to this type of hearsay as "inherently unreliable" and stated that "we have over the years 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.'" Lilly, 527 U.S. at 131 (plurality opinion) (quoting Lee, 476 U.S. at 541) (discussing the hearsay exception for statements against penal interest). "[E]ven when an alleged accomplice testifies, his confession that 'incriminate[s] himself together with defendant . . . ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses.'"

15

Id. (brackets and ellipsis points in original) (quoting Crawford v. United States, 212 U.S. 183, 204 (1909)).

> "[W]hen one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." This is so because
>
>> "the truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. . . . 'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'"

Id. at 132 (ellipsis points in original) (emphasis added) (citations and brackets omitted).

B.

The State argues that the Circuit Court properly admitted Robles' hearsay statements to the police that incriminated Derego under the hearsay exception for inconsistent statements set forth in HRE Rule 802.1(1). We disagree.

HRE Rule 802.1(1) provides as follows:

> **Rule 802.1. Hearsay exception; prior statements by witnesses.** The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:
>
>> (1) Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in compliance with rule 613(b), [6/] and the statement was:
>>
>>> (A) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or

---

6/ HRE Rule 613(b) (1993) provides:

(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

>    (B)    Reduced to writing and signed or otherwise
>           adopted or approved by the declarant; or
>
>    (C)    Recorded in substantially verbatim fashion
>           by stenographic, mechanical, electrical,
>           or other means contemporaneously with the
>           making of the statement[.]

(Emphasis added.)  The commentary to HRE Rule 802.1 provides in relevant part:

>         The trustworthiness of statements defined in paragraph
> (1)(A), (B), and (C) is further assured by the requirement
> that the witness-declarant be "subject to cross-examination
> concerning the subject matter of the statement."  The
> situation envisioned is one where the witness has testified
> about an event and his prior written statement also
> describes that event but is inconsistent with his testimony.
> Since the witness can be cross-examined about the event and
> the statement, the trier of fact is free to credit his
> present testimony or his prior statement in determining
> where the truth lies.  Because the witness is subject to
> cross-examination, the substantive use of his prior
> inconsistent statements does not infringe the sixth
> amendment confrontation rights of accused in criminal cases,
> see California v. Green, 399 U.S. 149 (1970).

(Emphasis added).

Here, the requirement of HRE Rule 802.1(1) that "[t]he declarant is subject to cross-examination concerning the subject matter of the declarant's statement" was not satisfied.  Because Robles asserted the Fifth Amendment privilege and refused to answer questions about the alleged murder and his prior statements incriminating Derego, Robles was not subject to cross-examination about the subject matter of his prior statements. See United States v. Torrez-Ortega, 184 F.3d 1128, 1131-32 (10th Cir. 1999) (holding that a witness who asserted an illegitimate claim of Fifth Amendment privilege and refused to answer questions was not subject to cross-examination about his prior statement within the meaning of federal rule of evidence similar to HRE Rule 802.1(1)); Porth v. State, 868 P.2d 236, 242 (Wyo. 1994) (holding that a witness who asserted the Fifth Amendment privilege and refused to answer questions was not subject to cross-examination under Wyoming evidence rule similar to HRE Rule 802.1).  Moreover, the situation envision by the commentary to HRE Rule 802.1 -- where the witness testifies about the event and

17

his or her prior statement, and the ability to cross-examine the witness about the event and the prior statement provides the trier of fact with a basis for determining where the truth lies -- was not present in this case.

In State v. Canady, 80 Hawai'i 469, 911 P.2d 104 (App. 1996), this court held that:

> HRE Rule 802.1(1) requires, as a guarantee of the trustworthiness of a prior inconsistent statement, that the witness be subject to cross-examination about the subject matter of the prior statement, that is, that the witness be capable of testifying substantively about the event, allowing the trier of fact to meaningfully compare the prior version of the event with the version recounted at trial before the statement would be admissible as substantive evidence of the matters stated therein.

Canady, 80 Hawai'i at 480-81, 911 P.2d at 115-16 (emphasis added) (footnote omitted). Because Robles refused to answer questions about events related to and surrounding Tang's murder, he did not testify substantively about these events at Derego's trial. Robles' refusal to answer questions about these events precluded Derego from cross-examining Robles about Robles' version of the events and left the jury without an adequate basis to assess the trustworthiness of the Robles' prior statements to the police. We conclude that Robles' prior statements to the police incriminating Derego were not admissible under HRE Rule 802.1(1) and that the Circuit Court erred in admitting these statements as substantive evidence pursuant to that rule.

C.

We also reject the State's claim that Robles' prior statements to the police incriminating Derego were admissible as statements against Robles' penal interest under HRE Rule 804(b)(3) (1993). As noted, a confession by an accomplice to the police that incriminates the defendant, which the prosecution seeks to introduce at trial, is viewed with "special suspicion" and as "presumptively unreliable." Lee, 476 U.S. at 539, 541; see Lilly, 527 U.S. at 130-33. The law is clear that although the self-inculpatory portions of a declarant's statement may be against his or her penal interest, the non-self-inculpatory

18

portions do not qualify as a statement against penal interest. <u>Williamson v. United States</u>, 512 U.S. 594, 599-601 (1994) (construing Federal Rules of Evidence (FRE) Rule 804(b)(3), on which HRE Rule 804(b)(3) is modeled, and holding that "[FRE Rule 804(b)(3)] does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"). We conclude that the portions of Robles' statements to the police that described Derego as the main perpetrator of the assault on Tang and the person responsible for causing Tang's death did not qualify as statements against Robles' penal interest under HRE Rule 804(b)(3).

D.

Hearsay is not admissible at trial unless it qualifies as an exception to the rule against hearsay. <u>See</u> HRE Rule 802 (1993). Robles' prior statements to the police incriminating Derego were hearsay because they were statements "other than one made by the declarant while testifying at trial . . ., offered in evidence to prove the truth of the matter asserted." HRE Rule 801 (Supp. 2014). Because Robles' prior statements to the police incriminating Derego did not fall within an exception to the rule against hearsay, the Circuit Court erred in admitting these statements.

We conclude, and that State does not dispute, that the Circuit Court's error in admitting Robles' prior statements to the police incriminating Derego was not harmless, in that "there is a reasonable possibility that the error complained of might have contributed to the conviction." <u>State v. Balisbisana</u>, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (internal quotation marks and citation omitted). We note that aside from arguing that the error in admitting these statements was not harmless, Derego does not explicitly challenge the sufficiency of the evidence without them.

In any event, we conclude that when viewed in the light most favorable to the prosecution, without considering Robles'

19

prior statements to the police incriminating Derego, there was sufficient evidence to support Derego's conviction.  The evidence showed that Derego and Robles caught a taxicab driven by Tang in Waikīkī to go to Waipahu; that this was Tang's last fare before his death; that Tang, Derego, and Robles were the three individuals a witness saw standing outside Tang's taxicab in the parking lot of the Waipahu Times Supermarket; that a short time later, Tang was found severely beaten on the ground with fatal injuries; that Derego and Robles were the individuals the witness saw running from the scene just prior to discovering Tang's body; that Tang's injuries were consistent with being kicked and punched; that when arrested several days later, Derego had apparent "red marks," abrasions, and/or swelling to the knuckles of his right hand and his right foot; that Derego was proficient in marital arts, including Muay Thai kick-boxing; that Derego and Robles were close friends, with Derego described as a leader and Robles as a follower; that shortly after Tang's murder, Derego ran away from the Hale Kipa facility; and that after his arrest, Derego made false exculpatory statements to the police regarding his whereabouts at the time of the murder and whether he had ever been in a taxicab, demonstrating his consciousness of guilt.  We conclude that aside from Robles' prior statements to the police incriminating Derego, there was substantial evidence to support Derego's conviction, and therefore, Derego is subject to retrial.

Accordingly, based on the Circuit Court's error in admitting Robles' prior statements to the police incriminating Derego, we vacate Derego's conviction and remand the case for a new trial.

II.

In light of our decision to vacate Derego's conviction based on the error in admitting of Robles' hearsay statements incriminating Derego, we need not address Derego's claim that his trial counsel provided ineffective assistance by failing to seek a jury instruction on the unreliability of eyewitness testimony. On remand, the Circuit Court should apply the Hawai'i Supreme

Court's decision in State v. Cabagbag, 127 Hawai'i 302, 277 P.3d 1207 (2012), with respect to instructing the jury on eyewitness testimony.

Based on State v. Lewis, 94 Hawai'i 292, 12 P.3d 1233 (2000), we conclude that the Circuit Court's failure to advise Derego of his right not to testify pursuant to Tachibana did not constitute harmful error. Lewis, 94 Hawai'i at 295, 12 P.3d at 1236 (holding that the colloquy requirement to advise a defendant that he or she has a right not to testify imposed by Tachibana "is required only 'in cases in which the defendant does not testify'"). Derego chose to testify in his own defense. He provides no basis for believing that his lawyer failed to properly advise him of his right not to testify or that his decision to testify was anything other than voluntarily, knowingly, and intelligently made. See id. at 296, 12 P.3d at 1237.[1/]

CONCLUSION

For the foregoing reasons, we vacate the Circuit Court's Amended Judgment, and we remand the case for a new trial.

DATED: Honolulu, Hawai'i, July 2, 2015.

On the briefs:

Kevin O'Grady
(Law Office of Kevin
O'Grady, LLC)
for Defendant-Appellant

James M. Anderson
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*

Chief Judge

*[signature]*

Associate Judge

*[signature]*

Associate Judge

---

[1/] On remand, the Circuit Court should advise Derego in accordance with State v. Monteil, 134 Hawai'i 361, 341 P.3d 567 (2014).